**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **STUART MILLS DAVENPORT**<br>**1700 1st Street NW**<br>**Washington, D.C. 20001**<br><br>**PLAINTIFF,**<br><br>**v.**<br><br>**BABAK DJOURABCHI**<br>**and**<br>**MONICA WELT**<br>**447 S. Drexel Avenue**<br>**Bexley, OH 43209**<br><br>**DEFENDANTS.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. ____________**<br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

## COMPLAINT

Plaintiff Stuart Mills Davenport ("Davenport"), through its attorneys Stinson Leonard Street LLP, asserts this Complaint against Defendants Babak Djourabchi and Monica Welt, husband and wife (collectively, "Defendants"), to recover at least $150,000.00, plus punitive damages in an amount to be determined by the trier of fact, plus interest, costs, and any allowable attorneys' and experts' fees and expenses, for wrongful foreclosure, breach of contract, tortious interference with a business relationship, and statutory claims.

For his Complaint, Davenport alleges as follows:

## PARTIES

1. Plaintiff Stuart Mills Davenport is a resident of the District of Columbia. At all relevant times, Davenport resided in the District of Columbia.

2. Upon information and belief, Defendants Babak Djourabchi and Monica Welt are now residents of Franklin County, Ohio.

3. At all times relevant to the events giving rise to the causes of action alleged in this Complaint, Defendants resided in the District of Columbia.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

5. Venue is proper in this Court because a substantial part of the events or omissions giving rise to this action occurred in the District of Columbia.

## FACTS

### Relationship of Parties

6. Davenport is a lay person whose profession is construction work and running a restaurant.

7. Davenport owns a multistory rowhouse at 1700 1st Street NW, Washington, D.C. 20001 (the "Property").

8. Davenport resides with his partner and children on the upper floors of the Property.

9. On the lower floors of the Property, Davenport operates a restaurant, Big Bear Café, LLC ("Big Bear"), an entity in which Davenport maintains a 100% ownership interest.

10. In 2006, Defendants resided at 1660 Beekman Place #D, NW, Washington, D.C., 20009.

11. Both Defendants were licensed and practicing as attorneys during all relevant times.

12. Defendants and Davenport were acquainted as neighbors, and they discussed loaning money to Davenport to help with his restaurant.

**Original Loan**

13. On September 21, 2006, Davenport borrowed $80,000 from Defendants and executed a *Promissory Note for Business and Commercial Purposes* in favor of Defendants in the principal sum of $80,000, with interest on the outstanding principal balance and any unpaid interest from September 21, 2006, at the rate of 10.5% per annum, compounded annually, and maturing on September 21, 2016 (the "Note"), attached hereto as **Exhibit 1**.

14. Pursuant to the terms of the Note, principal could not be paid before the maturity date unless the entire debt was paid, but interest could be paid in advance.

15. The result is that when Davenport overpaid interest that had accrued on the debt, the excess payment would not be applied to principal (unless the full debt was being repaid in full) and the excess payment would be held by Defendants in reserve as a credit toward obligations that came due in the future.

16. Monthly interest-only payments in the amount of $700.00 were due on the first of each month, in payment for the interest that accrued during the previous month.

17. The Note is secured by a standard Deed of Trust (District of Columbia Single family-Fannie Mae/Freddie Mac Uniform Instrument, Form 3009 1/01) on the Property, attached hereto as **Exhibit 2**.

18. Defendant Djourabchi, a lawyer, drafted the Note.

19. Defendant Djourabchi, not Davenport (a non-lawyer), drafted the language concerning payment of interest and when it would accrue.

20. Davenport was unsophisticated in financial matters and did not engage in negotiations regarding the accrual of interest and the timing of the payment of interest.

21. Paragraph five of the Note provides that default occurs only upon Davenport's failure to make a payment, "and the continuation of such failure for a period of 4 (four) calendar days[.]"

22. Paragraph five of the Note further provides that Defendants may "proceed in foreclosure on the [Property]" only "[u]pon occurrence of a Default[.]"

23. Paragraph seven of the Note provides that it "may not be amended without the written acceptance by all parties bound by this instrument."

24. Davenport and Defendants never entered into any written amendments of the Note.

**Davenport Immediately Begins Pre-Paying the Monthly Payments**

25. Upon Davenport's execution of the Note, Djourabchi verbally told Davenport to immediately pay $207.00 to cover the interest that would accrue between September 21 and October 1, 2006, and be due on October 1, 2006.

26. Although this payment was not due until October 1, 2006, Davenport promptly complied with Djourabchi's instruction.

27. Defendants did not tell Davenport that the initial interest payment amount should actually be $209.97, $2.97 more than Djourabchi verbally told Davenport pay. Consequently, $2.97 was still due on October 1, 2006.

28. On October 1, 2006, Davenport made a $700.00 payment for the interest that would accrue during the month of October and be due on November 1, 2006. This payment was

one month early, and exceeded the $2.97 remaining due on October 1 for the interest accrued during the initial 9-day period.

29. Davenport stayed ahead of payments for the remainder of the loan, and, as of October 14, 2015, had prepaid a total of $26,422.90 in interest, but still owed the original principal balance of $80,000.00.

**Defendants Misrepresent the Status of the Note and Intimidate Davenport**

30. Davenport continued to make monthly $700.00 payments on the Note before they were due, and also made additional payments, the first of which was for $1,500.00 on January 11, 2007.

31. Pursuant to the terms of the Note, Davenport's early and extra payments created an ever-growing "credit" held by Defendants in reserve to be used to satisfy obligations that came due in the future.

32. In January 2008, Defendants learned that Davenport had fallen behind on his first mortgage on the Property—a security interest senior to Defendants' security interest.

33. At this time, Defendants held more than $2,200 (over three months of regular payments) in credit for Davenport.

34. Nonetheless, Defendants told Davenport in person and in writing that the Note was in default because of the arrears Davenport owed on the first mortgage, and that Defendants were accelerating the Note so that the $80,000 in principal must be paid in full by September, 2008.

35. The Note contains no such default provision and does not authorize acceleration under these circumstances.

36. Defendants further threatened Davenport that:

- they would sell the Note to a "more aggressive" lender;
- they would foreclose if Davenport did not make a "lump sum" payment;
- that Davenport must pay an additional $300.00 per month or else they would foreclose.

37. Intimidated and afraid of Defendants' threats, and without consulting an attorney, Davenport agreed to pay an additional $300.00 per month (for a total of $1,000.00) beginning on September 1, 2008.

38. Defendants also told Davenport that he was current on the loan, but that to stay current, he must pay an additional $40.00 in "late fees" whenever he submitted a payment later than the 4th of a month.

39. Intimidated and afraid of Defendants' threats of foreclosure, Davenport accepted Defendants statements as true and included an additional $40.00 with his early-payments dozens of times.

40. In fact, because Davenport was significantly ahead on the loan, payments made after the 4th of a month were early, not late, and the "late fees" actually contributed to Davenport's ever-growing "credit" on the loan.

41. Nonetheless, in early 2008, Defendants began demanding financial information on Big Bear, claiming that they were entitled to the information to ensure their "investment" was safe. This included continual updates on applications for loans, an application for a zoning classification change of the building, and an application for a liquor license for Big Bear. Defendants also constantly pressured Davenport to pay the Note in full early, despite the Note's terms specifying it did not mature until 2016. (*See* 2008 & 2009 emails, attached hereto as **Exhibit 11**).

42. Feeling intimidated, Davenport complied with Defendants ongoing requests for information.

43. When Davenport did not immediately comply with Defendants' demands, Defendants escalated their demands and threatened Davenport with harmful consequences. For example, in a September 18, 2008 email, Djourabchi stated "the more you avoid the subject, the more anxious I become, and the less reasonable I will be—understood?" (**Exhibit 11** at Djourabchi 000445).

44. In a May 6, 2009 email, Djourabchi demanded a "late fee" for two months' payments, and inquired about getting Big Bear gift certificates and hauling work done at Defendants' home. (**Exhibit 11** at Djourabchi 000389).

45. Davenport did not respond for fear of being strong armed into giving away gift certificates or hauling services as gifts. But, over the next several weeks, Defendants escalated their pressure on Davenport. (*E.g.*, **Exhibit 11** at Djourabchi 000427 & 438).

46. In response to the escalating pressure, Davenport met with Defendants on June 7, 2009 at a busy public coffee shop.

47. At the coffee shop, Defendants attempted to shame Davenport into committing to pay the entire $80,000 on a quick timetable over the next two months. During this meeting, Ms. Welt yelled profanities at Davenport in the public place.

48. On August 18, 2009, at 1:46 p.m., Djourabchi emailed Davenport, claiming that the Note was in default and demanding that Davenport tender payment of $80,000 as payment in full by 3:30 p.m. that day. Djourabchi stated: "By the terms and conditions of the secondary lien on your property, ANY act of default on ANY debt owed by you constitutes a breach and immediate acceleration of all debts owed." Djourabchi further threatened to engage an attorney

to draft a notice of acceleration and foreclose on the Property, and that Davenport would be responsible for all attorneys' fees and costs. (**Exhibit 11** at Djourabchi 000440).

49. In fact, the Note contains no such default provision and does not authorize acceleration under these circumstances. Moreover, Davenport was significantly ahead on the loan so the Note could not be in Default.

**Davenport Seeks Bankruptcy Protection and Defendants Swear He Is Not In Arrears**

50. On September 2, 2009, Davenport filed for Chapter 13 bankruptcy protection in the U.S. Bankruptcy Court for the District of Columbia, *In re Stuart Mills Davenport*, Case No. 09-00772 (the "First Case").

51. By filing the First Case, the Bankruptcy Code, 11 U.S.C. § 362, created an automatic stay forbidding Defendants from foreclosing on the Property.

52. In his filings, Davenport identified the Note as a secured obligation due to Defendants in the amount of $80,000.00.

53. Because Defendants repeatedly represented to Davenport that he was (1) only "current" on the Note (not accruing a "credit") and (2) occasionally making "late" payments, Davenport did not understand that his early payments had actually accumulated into several thousand dollars of "credit" toward future obligations on the Note as they came due.

54. On October 19, 2009, Defendants filed their Proof of Claim ("2009 POC", attached hereto as **Exhibit 3**), stating under penalty of perjury that Davenport owed a total of $80,000.00 (the original principal amount), including all amounts "past due on the claim as of the day of the bankruptcy filing" on the secured Note, and disclosing that there were no other charges as of the time the case was filed that were included in the secured claim.

55. Defendants did not disclose the fact that they actually held several thousand dollars in "credit" from Davenport's early payments, to be used to satisfy future obligations on the Note as they became due.

56. The 2009 POC was signed by Joel S. Aronson ("Aronson"), counsel for Defendants in the First Case.

57. On March 31, 2010, Davenport filed his Third Amended Plan ("Plan") in the First Case, which provided that he would make post-petition payments directly to certain creditors, and that the trustee will make payments to those creditors to cure all pre-petition arrears, costs, and fees.

58. Because Davenport did not believe he had any pre-petition arrearages on his obligation to Defendants, and because Defendants filed their 2009 POC asserting that there were no pre-petition arrearages owed to them, Davenport did not include Defendants in the Plan.

59. The Bankruptcy Court approved the Plan, thereby permitting Davenport to continue paying Defendants pursuant to the Note outside of the Plan.

60. Defendants did not object to their treatment in the Plan, and the Bankruptcy Court confirmed the Plan by Order entered March 31, 2010.

61. Davenport continued to make early monthly payments of at least $1,000.00 to Defendants, continuously growing his "credit."

62. Defendants never filed a motion seeking relief from the 11 U.S.C. § 362 automatic stay in order to foreclose on their lien on the Property.

**<u>Defendants Again Swear Davenport Is Not In Arrears</u>**

63. On September 3, 2013, nearly four years after filing their 2009 POC, and more than three years after confirmation of the Plan, Defendants filed an Amended Proof of Claim in

the First Case (the first two pages of which are attached hereto as **Exhibit 4**), again swearing under penalty of perjury that Davenport owed only $80,000.00 under the secured Note, including all amounts "past due on the claim as of the day of the bankruptcy filing" on the secured Note, and that there were no arrearages.

64. The Amended Proof of Claim was signed by Aronson, counsel for Defendants in the First Case, and was never thereafter further amended.

65. Davenport continued to make early monthly payments of at least $1,000.00 to Defendants, continuously growing his "credit."

**Defendants Flip Their Position, Doctor the Record, and Attack Davenport**

66. By early-2015, with the help of counsel, Davenport realized Defendants had been requiring him to make additional payments beyond what he was required to pay under the Note.

67. On March 12, 2015, Davenport filed a Debtor's Corrected Application for an Order to Show Cause (the "Application") in the First Case alleging the Defendants were violating the 11 U.S.C. § 362 automatic stay and the Confirmation Order entered by the Bankruptcy Court by requiring Davenport to make $300.00 a month extra payments (paying $1,000.00 per month, instead of the $700.00 required by the Note).

68. On March 24, 2015, after Davenport completed his Plan payments, Defendants filed an Opposition to the Application.

69. In the Opposition, for the first time, Defendants alleged that Davenport had been in arrears on the Note since September 21, 2006—the very day it was executed.

70. Defendants alleged, for the first time that Davenport's initial $207.00 payment was $2.97 too little, and therefore $10.00 per day in penalties and late fees had been accruing for nearly nine years.

71. Defendants' allegations regarding the existence of pre-petition arrearages was a direct contradiction of the sworn statements they made under penalty of perjury in their 2009 POC and Amended 2009 POC, and had never before been alleged.

72. The Bankruptcy Court held a hearing and denied Davenport relief, but did not rule on the amounts then due to Defendants under the Note.

73. Thereafter, on June 18, 2015, Aronson, on behalf of Defendants, emailed Davenport that the amount due on the Note as of June 30, 2015, would be $114,568.07. A copy of the email is attached hereto as **Exhibit 5**.

74. In fact, as of June 30, 2015, Davenport's "credit" for early interest payments had grown to over $20,000.00, and the principal balance owed remained the original $80,000.00.

75. In an attempt to resolve this within the First Case, on July 15, 2015, Davenport filed a Revised Motion to Determine Final Cure and Payment, within which he pointed out Defendants contradiction of their sworn statements, and asked the Court for relief.

76. On July 27, 2015, Defendants filed an opposition to Davenport's motion, in which they alleged Davenport had known he had been continually in arrears since November 2006, and had consistently made late payments and missed others.

77. To support their allegations, for the first time, Defendants attached an excel spreadsheet purporting to document Davenport's payments, interest owed, late fees, and total arrearage, from September 21, 2006 through April 1, 2015, totaling $11,242.97 owed as of April 1, 2015.

78. In fact, Defendants exhibit omitted ten payments made by Davenport, beginning with Davenport's extra payment of $1,500.00 on January 11, 2009, and totaling $7,015.00. An annotated copy of the exhibit showing the omitted payments is attached hereto as **Exhibit 6**.

79. In fact, Davenport had always been ahead on his payments, and as of April 1, 2015, Davenport's extra and early payments totaled to a "credit" of at least $20,000.00.

80. On September 8, 2015, Davenport filed his reply in support of his motion.

**Defendants Attempt to Foreclose on the Property**

81. Although Davenport's motion was still pending, and despite the fact that Davenport was not currently and had never been in default of the Note, in September 2015, Defendants attempted to foreclose on the Property.

82. On or about September 11, 2015, Djourabchi executed an Affidavit of Non-Residential Mortgage Foreclosure for the Property, attached hereto as **Exhibit 7**.

83. On or about September 15, 2015, Defendants appointed Aronson as Trustee of the Deed of Trust on the Property, and instructed him to foreclose on the Property.

84. On September 15, 2015, Aronson, at Defendants direction, recorded a Notice of Foreclosure Sale of Real Property or Condominium Unit (the "Foreclosure Notice"), a copy of which is attached hereto as **Exhibit 8**.

85. In the Foreclosure Notice, Aronson declared that the balance owed on the Note was $119,428.07, and scheduled a public auction for October 20, 2015.

86. In fact, as of September 17, 2015, Davenport only owed a balance of $80,000.00 in principal, and had accumulated over $25,000.00 in "credit" from his extra and early payments.

87. On September 17, 2015, Aronson forwarded a courtesy copy of the Foreclosure Notice to Davenport, advising him that the Property was going to be sold at auction on October 20, 2015.

88. The Foreclosure Notice also declares Davenport must contact Aronson "to stop foreclosure sale."

89. The foreclosure was scheduled for the benefit of Defendants notwithstanding that Davenport was not then, and had never been, in default on his obligations to Defendants under the Note.

90. Knowing that he was not in default on the Note and that Defendants were pursuing an unlawful foreclosure, Davenport waited and hoped that the Bankruptcy Court would rule on the Final Cure Motion in the First Case in sufficient time to avoid the announced foreclosure sale without having to take any further judicial action.

**The Wrongful Foreclosure Proceedings Directly Harm Davenport's Restaurant, Big Bear**

91. After the September 15, 2016 start of the foreclosure proceedings, "cash sale" lenders and foreclosure buyers repeatedly came to and entered Big Bear, located in the Property, and asked restaurant staff and customers questions about the scheduled foreclosure auction.

92. These interruptions occurred during both regular business hours and special events, disrupted the restaurant, hurt staff morale, harmed Big Bear's reputation with is customers, and resulted in lost revenue.

93. One "buyer" entered Big Bear during a private $10,000 wedding party rehearsal dinner and proceeded to question party guests and staff about the foreclosure and "delinquent debt." After Davenport repeatedly asked the "buyer" to leave, the "buyer" yelled in front of everyone in attendance "It's reasons like this you're in foreclosure!"

94. Private events are a major source of marketing and revenue for Big Bear, and this harmed Big Bear's business.

**To Avoid the Wrongful Foreclosure, Davenport Must Again Declare Bankruptcy**

95. Knowing that he was not in default on his obligations to Defendants and that Defendants were pursuing an unlawful foreclosure, Davenport waited and hoped that the

Bankruptcy Court would rule on the Final Cure Motion in the First Case in sufficient time to avoid the announced foreclosure sale without having to take any further judicial action.

96. But the Bankruptcy Court did not rule in time, and knowing that he was not in default on his obligation to Defendants, Davenport had no alternative but to file a new bankruptcy case to stay the foreclosure sale.

97. On October 14, 2015, Davenport filed a voluntary Chapter 13 bankruptcy petition in the U.S. Bankruptcy Court for the District of Columbia, *In re Stuart Mills Davenport*, Case No. 15-00540 (the "Second Case").

98. The Second Case included an automatic stay of the foreclosure proceedings, pursuant to which Defendants must cancel the scheduled foreclosure auction.

**Defendants Continue to Harass Davenport, Directly Harming Big Bear**

99. On October 19, 2015, Davenport learned that Defendants had not canceled the foreclosure auction, and Davenport had to repeatedly contact and follow-up with Aronson to ensure Defendants cancelled the auction.

100. On October 20, 2015, the day the foreclosure auction had been scheduled for, Djourabchi entered Big Bear and sat in the middle of the café. He occupied a valuable central table, but ordered nothing and instead took notes while observing the restaurant. Davenport repeatedly asked Djourabchi to leave, but Djourabchi refused.

101. Eventually, Davenport told Djourabchi he was trespassing, and that his actions were harassment and a violation of the bankruptcy stay. Eventually, Djourabchi left.

102. Davenport contacted the police and filed a notice with the police that Djourabchi was barred from the Property.

103. Later that day, Djourabchi returned, and again left after repeatedly being asked to leave.

104. Djourabchi's harassment was highly visible to patrons and staff at Big Bear, and was disruptive to Big Bear's operation. The harassment damaged Big Bear's business reputation and staff morale, and was harmful to the restaurant.

105. Djourabchi's harassment occurred when Davenport's father was in town visiting his grandchildren, Davenport's children. Djourabchi's harassment caused Davenport and his family so much emotional distress and fear that Davenport's partner and children refused to leave the upstairs residence while Djourabchi was present.

106. On October 22, 2015, two days after the previously scheduled foreclosure auction, someone misrepresented themselves as the owner of Davenport's neighboring residential property located at 1710 1st Street (which has been listed as an asset of Davenport's in the Chapter 13 plan) and listed it for sale on Zillow.com. This created an incorrect record of the Davenport's real property, including requesting a sale price inconsistent with the value of the property and uploading a picture of another building to misrepresent the property. At least 1,000 Zillow users "viewed" the false listing, perpetuating the incorrect information and harming Davenport's ability to sell the property.

107. Shortly thereafter, Davenport learned that someone had been spreading rumors that Big Bear was closing due to foreclosure or bankruptcy. These rumors harmed Big Bear's reputation with its customers and staff morale, thereby harming the restaurant.

108. During the pendency of the dispute between Davenport and Defendants over the amounts owed under the Note, an "anonymous" person filed multiple complaints against Big bear with the District of Columbia Health Department:

- On August 19, 2014, before Davenport's final Plan payment in the First Case;
- On October 30, 2015, days after Djourabchi was barred from the property on the day of the cancelled foreclosure sale, and two weeks after filing the Second Case; and,
- On July 26, 2016, five days after the Bankruptcy Court's final decision in the Second Case establishing Davenport had never been in default.

109. During 10 years of operation, Big Bear had never previously suffered an "anonymous" complaint.

110. Upon information and belief, Defendants either performed the acts described in paragraphs 91 through 101, or were aware of and complicit in their performance.

**The Bankruptcy Court Vindicates Davenport**

111. During the course of the Second Case, and in contradiction of their sworn 2009 POC and Amended 2009 POC, Defendants filed a Proof of Claim alleging that the total amount due under the Note as of October 14, 2015, was $121,813.88, including arrearages and other charges.

112. Davenport objected that the amount actually due under the Note was $54,435.00, representing $80,000.00 in principal and $25,565.00 in "credit" from Davenport's nine-years of early and extra interest payments.

113. Davenport and Defendants fully briefed their positions, submitted evidence, and the Bankruptcy Court held a hearing to adjudicate the merits of the dispute.

114. On July 21, 2016, the Bankruptcy Court issued a Memorandum Decision and entered an Order (attached hereto as **Exhibits 9 & 10**), in which the Court found facts, made conclusions of law, and ruled, *inter alia*:

- As of October 14, 2015, Davenport owed $80,000.00 in principal on the Note, but had a credit in his favor of $26,422.90 for interest or other obligations accruing thereafter under the Note (a total net indebtedness of $53,557.10);
- **Davenport had never been in default on the Note**; and,
- Defendants' factual representations regarding the arrearages, Davenport's knowledge, and supposed conversations and agreements between the Parties contrary to the terms of the Note were not credible.

115. Defendants did not appeal the Bankruptcy Court's Memorandum Decision or Order, and the time to appeal has now expired. *See* Federal Rule of Bankruptcy Procedure 8002.

116. Davenport incurred over $70,000.00 in attorneys' fees and expenses successfully contesting Defendants' counterfactual claims of arrearages and attempts to foreclose on the Property, despite Davenport not being in default on the Note.

## COUNT I
## WRONGFUL FORECLOSURE

117. Davenport incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully restated in this paragraph.

118. Defendants instigated foreclosure on the Property without justification, and despite the fact that Davenport was not in default, and had never been in default, during the life of the Note.

119. As evidenced by their 2009 POC and Amended 2009 POC in the First Case, sworn under penalty of perjury, Defendants knew or should have known that Davenport was not in default on the Note, and, in fact, had more than a $26,000.00 credit in his favor from accumulated extra and early payments.

120. Defendants made numerous false representations to Davenport about the status of his loan and the timing of his payments, convincing him that he owed $40.00 "late payments" whenever he paid after the fourth of the month, despite the fact that he had prepaid many years' worth of regular interest payments.

121. Despite having previously twice sworn under penalty of perjury that no arrearages were owed, thereafter manufactured tens of thousands of dollars in arrearages by claiming, eight years after the execution of the loan, that it had been in default since day one.

122. Defendants created an excel payment schedule omitting ten of Davenport's payments to "evidence" Davenport's arrearages, and submitted it to the bankruptcy Court with knowing or reckless disregard for its truth.

123. As a direct result of Defendants' Wrongful Foreclosure, Davenport suffered injury, including but not limited to, financial loss, harm to his restaurant, Big Bear, loss of reputation in the community, emotional distress, the use and enjoyment of over $26,000.00 in "credit" held by Defendants, the costs and expenses of bankruptcy, and attorneys' fees and costs.

124. Defendants' acts and omissions regarding the Note and falsely alleged arrearages, numerous misrepresentations to Davenport and the Bankruptcy Courts, and harassing actions targeting Big Bear evidence Defendants' evil motive, actual malice, intent to injure, or willful disregard of Davenport's rights, and therefore entitle Davenport to punitive damages in an amount to be determined by the trier of fact.

## COUNT II
## BREACH OF CONTRACT

125. Davenport incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully restated in this paragraph.

126. Davenport and Defendants entered into a written contract, the Note.

127. The terms of the note authorized a foreclosure on the Property only if Davenport was in default.

128. Defendants materially breached the Note and instigated foreclosure proceedings when Davenport was not, and had never been, in default of the Note.

129. Defendants also violated the duty of good faith and fair dealing, inherent in every contract, by leveraging their superior legal knowledge and Davenport's relative lack of financial sophistication to intimidate, threaten, and coerce Davenport into paying them over $26,000.00 dollars more than he was obligated to under the terms of the Note.

130. Defendants' breach of contract caused Davenport injuries, including but not limited to financial loss, harm to his restaurant, Big Bear, loss of reputation in the community, emotional distress, the use and enjoyment of over $26,000.00 in "credit" held by Defendants, the costs and expenses of bankruptcy, and attorneys' fees and costs.

131. Defendants' coercive actions and numerous misrepresentations, including contradicting their twice sworn statement that Davenport owed no arrearages, demonstrate intent to defraud Davenport through the Note and entitles Davenport to punitive damages in an amount to be determined by the trier of fact.

**COUNT III**
**VIOLATION OF D.C. CODE §§ 28-3301, *et seq.***

132. Davenport incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully restated in this paragraph.

133. In falsely claiming Davenport owed arrearages on the Note and instituting foreclosure proceedings against the Property when the Note was not in Default, Defendants misrepresented material facts and failed to state material facts, including, but not limited to, facts regarding Davenports payment history, conversations and agreements between the Parties, and

whether Davenport was in arrearages or default on the Note, in violation of D.C. Code § 28-3312(1) & (2).

134. Through the harassing actions described above, including disrupting Davenport's operation of Big Bear, "anonymously" complaining to the health department, spreading rumors about Big Bear's closure, and/or falsely listing the Property as for sale on Zillow.com, Defendants disparaged Davenport's restaurant business with false and misleading representations of material facts, in violation of D.C. Code § 28-3312(3).

135. Defendants acts and omissions in violation of D.C. Code §§ 28-3301, *et seq*. caused Davenport injuries, including but not limited to financial loss, harm to his restaurant, Big Bear, loss of reputation in the community, emotional distress, the use and enjoyment of over $26,000.00 in "credit" held by Defendants, harm to his credit, including increased difficulty in accessing financing, renewing licenses and expanding the business, the costs and expenses of bankruptcy, and attorneys' fees and costs.

136. Pursuant to D.C. Code § 28-3314, Defendants acts and omissions in violation of D.C. Code §§ 28-3301, *et seq*. further entitle Davenport to reasonable attorney's fees, actual and punitive damages, and any other relief which the court deems proper.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**

137. Davenport incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully restated in this paragraph.

138. Davenport owns and operates the Big Bear restaurant on the property, which relies on high staff morale, strong customer reputation, and successfully hosting large events to market the business and earn the repeat diners necessary to keep the business successful.

139. Defendants knew Davenport owns and operates Big Bear on the Property.

140. Defendants knew, or should have known that Big Bear's reputation with its customers, staff morale, and ability to host large events were keys to Big Bear's success.

141. Defendants knew or should have known, and intentionally or recklessly disregarded the negative impact instituting a foreclosure proceeding would have on Big Bear, including, but not limited to, causing "cash sale" lenders and foreclosure buyers to enter the Property and disrupt Big Bear's operation, thereby harming Big Bear's reputation with its customers, staff morale, and ability to host large events.

142. Djourabchi personally entered Big Bear, after the foreclosure sale was cancelled, refused to leave the premises, disrupted its operations, and harmed customer reputation and staff morale.

143. Defendants knew or should have known the negative impact that making "anonymous" complaints to the health department would have, and did have, on Big Bear.

144. Defendants knew or should have known the negative impact that falsely listing the Property for sale on Zillow.com and/or spreading false rumors about Big Bear's impending closure would have, and did have on Big Bear.

145. Defendants' intentional harassing acts and omissions harmed Big Bear's staff morale, reputation with its customers, and ability to host large events, thereby causing a decrease in revenue and other consequential damages, in an amount to be determined by the trier of fact.

146. Defendants' acts and omissions regarding Big Bear evidence Defendants' evil motive, actual malice, intent to injure, or willful disregard of Davenport's rights, and therefore entitle Davenport to punitive damages in an amount to be determined by the trier of fact.

**WHEREFORE**, Plaintiff Stuart Mills Davenport respectfully requests judgment in his favor and against Defendants Babak Djourabchi and Monica Welt, husband and wife, jointly and severally, in the principal amount of at least $150,000.00 together with prejudgment and post-judgment interest, punitive damages in an amount to be determined by the trier of fact, costs, and any allowable attorneys' and experts' fees and expenses; together with any further relief in Davenport's favor as this Court deems just.

**Dated: December 12, 2016** **Respectfully submitted by**

**STINSON LEONARD STREET, LLP**

__/s/ Michael Tucci__
Michael Tucci (DC Bar No.: 430470)
Brandon R. Nagy (DC Bar No.: 1024717)
1775 Pennsylvania Ave., NW
Suite 800
Washington, D.C. 20006
Tel.: (202) 785-9100
Fax: (202) 572-9950
Email: michael.tucci@stinson.com
brandon.nagy@stinson.com

***Counsel for Plaintiff***
***Stuart Mills Davenport***

**JURY DEMAND**

Plaintiff Stuart Mills Davenport respectfully demands a jury trial on all triable issues.

__/s/ Michael Tucci
Michael Tucci