## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STUART MILLS DAVENPORT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 16-02445 (ABJ/RMM) |
| | ) |
| BABAK DJOURABCHI, *et al.*, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is a discovery dispute regarding Plaintiff Stuart Mills Davenport's Proposed Deposition Questions ("PDQs") and Defendants Babak Djourabchi and Monica Welt's (collectively, "Defendants") attorney-client privilege and work-product objections. Judge Jackson referred this discovery dispute to the undersigned Magistrate Judge. *See* Order, ECF No. 42. Having reviewed the parties' written submissions and the entire record herein,[1] the Court SUSTAINS Defendants' Objections to PDQs 1–3, 5–11, 26–27, 32–34, 40, 42–43, 49, and 51–52, with PDQs 1, 2, 3, 5, 6, 9, 10, 27, 34, 43 and 52 sustained in part; OVERRULES Defendants' Objections to PDQs 4, 12, 16–17, 36, and 45; OVERRULES Defendants' Objections to PDQs 28, 35, 44, and 53, with the exception that Defendants may decline to disclose remedial communications with their attorney; MODIFIES PDQs 13–14, and 22; STRIKES PDQs 18 and 19 as duplicative of modified PDQ 13; STRIKES PDQs 15, 20–21,

---

[1] *See* Joint Status Report, ECF No. 40; Defs.' Mem. Supp. Privilege Objections, ECF No. 44 ("Defs.' Mem."); Pl.'s Mem. Opp'n Defs.' Privilege Objections, ECF No. 47 ("Pl.'s Resp."); Defs.' Reply Pl.'s Mem. Opp'n Defs.' Privilege Objections, ECF No. 48 ("Defs.' Reply"); Pl.'s Sur-Reply Opp'n Defs.' Privilege Objections, ECF No. 49 ("Pl.'s Sur-Reply").

25, 30, 37, 41, 46, and 50 as duplicative of modified PDQ 14; STRIKES PDQs 23, 24, 29, 31,

38–40, and 47–48 as duplicative of modified PDQ 22; and OVERRULES Defendants' Objection

to PDQ 54 as waived.[2]

## BACKGROUND

### I.  Factual History[3]

On September 21, 2006, Mr. Davenport executed a promissory note (the "Note") in favor

of Defendants, husband and wife Babak Djourabchi and Monica Welt, in the principal sum of

$80,000, which he planned to use to complete residential renovations.  *See* Pl.'s First Am.

Compl. ("Am. Compl.") ¶ 14.  Under the terms of the Note, interest could be paid in advance,

but not the principal unless the entire debt was paid.  *Id.* ¶ 18.  Any overpayments would be

applied as a credit toward future obligations.  *Id.* ¶ 19.  The Note was secured by real property

(the "Property") owned by Mr. Davenport.  *Id.* ¶¶ 8, 16.

Upon execution of the Note, Defendants informed Mr. Davenport that $207 would be due

immediately to cover interest payments for the period between the Note's execution on

September 21, 2006 and October 1, 2006.  *Id.* ¶ 29.  Mr. Davenport promptly paid Defendants

$207.  *Id.* ¶ 30.  The amount due for that partial month, however, was actually $209.97, meaning

$2.97 was still due on October 1, 2006.  *Id.* ¶ 31.  That said, on October 1, 2006, Mr. Davenport

made an early $700 payment for the interest accruing from October 1 to November 1, 2006.  *Id.*

¶ 32.  Mr. Davenport continued to make $700 monthly payments before they were due, and also

---

[2] For organizational purposes, the Court provides a table describing each PDQ and the Court's ruling as Appendix 1.

[3]  Given the procedural posture of the case, the Court relies on the facts alleged in the Complaint.

made several additional payments. *Id.* ¶ 34. By January 2008, Defendants held more than $2,200 —more than three months of regular payments—in credit for Mr. Davenport. *Id.* ¶ 37.

In 2008, Defendants learned that Mr. Davenport had fallen behind on a senior security interest on the Property—his first mortgage. *Id.* ¶ 36. Because of the arrears owed on his first mortgage, Defendants informed Mr. Davenport that the Note was in Default, and therefore he must pay an additional $300.00 each month as well as late fees for any monthly payment submitted after the 4th of the month. *Id.* ¶¶ 38, 40–42. Mr. Davenport agreed to increase his monthly payments from $700 to $1,000, and to pay a $40 "late fee" for payments submitted after the 4th of the month. *Id.* Even after these concessions, Defendants demanded more; they continuously requested supplemental financial information and progress reports, an additional "late fee," and they pressured Mr. Davenport to pay off the Note in full. *See id.* ¶¶ 45–51. Mr. Davenport refused, and Defendants informed him that the Note was in default, that the $80,000 principal was due, and that Defendants may seek to foreclose on the Property. *Id.* ¶ 52. Mr. Davenport claims that, under the terms of the Note, he was not in default. *Id.* ¶ 53.

On September 9, 2009, Mr. Davenport filed for Chapter 13 bankruptcy protection. *See id.* ¶ 54; *see also In re Stuart Mills Davenport,* Case No. 09-772 (Bankr. D.D.C.) (hereinafter, the "First Case"). In the First Case, Defendants filed a Proof of Claim (the "2009 POC"), stating that Mr. Davenport owed $80,000, including all amounts "past due on the claim as of the day of the bankruptcy filing" on the Note, and disclosing no other charges. *See* Am. Compl. ¶ 58. The 2009 POC was signed by Joel S. Aronson, an attorney the Defendants engaged to represent them with respect to the Note. *Id.* ¶ 60. The Bankruptcy Court confirmed a post-petition payment plan (the "Plan") which provided for the resolution of all pre-petition arrears, costs, and fees. *Id.* ¶ 63. Because Mr. Davenport believed he did not owe Defendants pre-petition arrearages, and

because the Defendants did not claim otherwise in their 2009 POC, the Plan did not include

Defendants.  *Id.* ¶ 62.  As such, Mr. Davenport was permitted to continue paying Defendants

under the terms of the Note, outside of the Plan.  Defendants never objected to that arrangement.

*Id.* ¶¶ 61–64.

On September 3, 2013, Defendants filed an amended Proof of Claim in the First Case

(the "Amended 2009 POC"), asserting that Mr. Davenport owed $80,000 under the Note,

including all amounts "past due on the claim as of the day of the bankruptcy filing," and that

there were no arrearages.  *Id.* ¶ 67.  The Amended 2009 POC was also signed by Mr. Aronson.

*Id.* ¶ 68.

Mr. Davenport continued to make monthly payments of $1,000 until November 2014.  *Id.*

¶¶ 65, 69, 72.  On November 13, 2013, Defendants sent an email to Mr. Davenport (the

"November 13, 2013 Email"), informing him that the additional $300 monthly payments went to

"late fees," that the balance due was $80,000, and that Mr. Davenport owed an additional $3,450

in "legal fees."  *Id.* ¶ 71.  Later that month, Defendants informed Mr. Davenport that he had been

in "default status" since November 2006, and demanded that Mr. Davenport pay "delinquent

default penalties."  *Id.* ¶ 73.

On March 12, 2015, Mr. Davenport filed an Application in the First Case alleging that

Defendants' demand that Mr. Davenport pay an additional $300 per month violated the

automatic stay and the Bankruptcy Court's Plan.  *Id* ¶ 76.  Defendants opposed the Application,

asserting that Mr. Davenport's initial $207 payment for the partial month accruing from

September 21, 2006 to October 1, 2006 had been $2.97 deficient, and that $10 per day late fees

had been accruing as a result.  *Id.* ¶ 79.  On June 18, 2015, Mr. Aronson sent an email to Mr.

Davenport (the "June 18, 2015 Email"), informing Mr. Davenport that the amount due on the

Note would be $114,568.07.  *Id.* ¶ 82.  Mr. Davenport moved the Bankruptcy Court to determine

a final cure and payment for the Note.  Before the Bankruptcy Court ruled on that motion,

Defendants attempted to foreclose on the Property, appointing Mr. Aronson as Trustee of the

Deed of Trust on the Property, and instructing Mr. Aronson to record a Notice of Foreclosure

Sale of Real Property or Condominium Unit (the "Foreclosure Notice").  *Id.* ¶¶ 92–93.

On October 14, 2015, to avoid foreclosure on the Property, Mr. Davenport filed a second

Chapter 13 bankruptcy petition.  *Id.* ¶ 106; *see also In re Stuart Mills Davenport,* Case No. 15-

540 (Bankr. D.D.C.) (hereinafter, the "Second Case").  At that time, Mr. Davenport had prepaid

a total of $26,422.90 in interest, but still owed the original principal sum of $80,000.  *See Am.*

*Compl.* ¶ 33.  In the Second Case, Defendants filed a Proof of Claim ("2015 POC"), asserting

that Mr. Davenport owed $121,813.88 on the Note.  *Id.* ¶ 120.  Mr. Davenport objected, and the

Bankruptcy Court ruled that Mr. Davenport owed only $53,557.10.  *Id.* ¶ 123.  Specifically, the

Bankruptcy Court found that Mr. Davenport owed the $80,000 principal, that he had never been

in default, and that he had accrued $26,422.90 in credit for previous overpayments.  *Id.*; *see also*

*id.* ¶ 33.

## II.  Procedural History

Mr. Davenport filed his complaint in this court on February 2, 2017, alleging breach of

contract and violation of D.C.'s usury statute.[4]  *Id.* ¶¶ 148–63.  Specifically, Mr. Davenport

alleges that Defendants violated the duty of good faith and fair dealing by demanding a greater

---

[4] The remaining counts have been dismissed.  The Court partially granted Defendants' Motion to Dismiss, dismissing Counts 1, 4, 5, and 6, as well as Count 3 as to Big Bear Cafe.  *See* Hr'g Tr. at 23:21–24, 36:14–18, ECF No. 23.  After Mr. Davenport and Big Bear Café filed a Stipulation of Voluntary Dismissal, the Court also dismissed all claims asserted by Big Bear Cafe (Count 3 and 7).  *See* Order, ECF No. 34.

sum than was actually owed on the Note, providing incorrect pay-off amounts, and falsely claiming Mr. Davenport owed arrearages. *Id.* ¶ 153–54, 160.

During fact discovery, Mr. Davenport deposed Defendants—Mr. Djourabchi and Ms. Welt—regarding four "Aronson Documents": the 2009 POC, the Amended 2009 POC, Mr. Aronson's November 20, 2013 email to Mr. Markley, and Mr. Aronson's June 18, 2015 email to Mr. Davenport. *See* Defs.' Mem. at 5. Defendants simultaneously suggest that the Aronson Documents were "notices" to Mr. Davenport regarding his indebtedness and that they were unauthorized and inaccurate as to the amount Mr. Davenport owed. *See* Pls.' Opp'n at 4. At their respective depositions, Defendants also both testified that they did not review the Aronson Documents before Mr. Aronson filed or transmitted the documents. *See* Defs.' Mem. at 6. Both Defendants refused to answer any questions related to the Aronson Documents, including questions regarding their communications with Mr. Aronson regarding their creation and transmission, asserting that the information Mr. Davenport sought is privileged. *Id.* The parties filed a joint status report indicating that they were unable to resolve their dispute over these questions. *See* Joint Status Report, ECF No. 39. The parties subsequently filed a complete list of the PDQs to which Mr. Davenport still seeks an answer along with Defendants' objections. *See* Joint Status Report, ECF No. 40. The undersigned held a status conference and subsequently ordered written briefing. *See* 2/5/2020 Min. Entry.

**LEGAL STANDARDS**

### I. The Attorney-Client Privilege

Under D.C. law, the attorney-client privilege applies:

> (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6)

> are at his instance permanently protected (7) from disclosure by
> himself or by the legal adviser, (8) except the protection be waived.[5]

*Jones v. United States*, 828 A.2d 169, 175 (D.C. 2003) (citing 8 Wigmore, Evidence

§ 2292 (McNaughton rev. 1961)).

The privilege is narrowly construed "to protect only those purposes which it serves," *i.e.,*

the "full and frank communication between attorneys and their clients."  *Id.* at 174. "The party

asserting the attorney-client privilege has the burden of proving that communications are

protected by that privilege."  *In re Public Defender Serv.,* 831 A.2d 890, 902 (D.C. 2003)

(internal citation omitted).  "In certain circumstances, where application of the attorney-client

privilege would not serve the purpose for which it is intended, courts have deemed the privilege

waived."  *Wender v. United Services Auto. Ass'n,* 434 A.2d 1372, 1374 (D.C. 1981).  Once the

privilege is waived, "the other party should receive access to the remaining relevant withheld

materials."  *Edmund J. Flynn Co. v. LaVay¸* 431 A.2d 543, 551 (D.C. 1981).

## II.  The Work-Product Doctrine

The work-product doctrine is a qualified protection provided under Federal Rule of Civil

Procedure 26 and the Supreme Court's decision in *Hickman v. Taylor,* 329 U.S. 495 (1947)*.  See*

*U.S. v. Deloitte LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010).  "The work-product privilege protects

documents prepared in anticipation of litigation regardless of whether the anticipated litigation

ever occurs."  *In re Sealed Case*, 146 F.3d 881, 888 (D.C. Cir. 1998).  All that is required is that

---

[5] D.C. privilege law governs Defendants' privilege objection because D.C. law supplies
the rules of decision for Mr. Davenport's remaining claims.  *See Linde Thomas Langworthy
Kohn & Van Dyke, P.C. v. Resolution Trust Corp.,* 5 F.3d 1508, 1512 (D.C. Cir. 1993) ("Federal
Rule of Evidence 501 mandates the application of state privileges in civil actions or proceedings
for which state law supplies the rules of decision."); *see also* Fed. R. Evid. 501.  The parties
agree that D.C. privilege law applies. *See* Defs.' Mem. at 8 n.14 (citing Fed. R. Evid. 501); Pl.'s
Resp. at 5 n.4.

"the lawyer . . . had a subjective belief that litigation was a real possibility" and that the lawyer's belief was "objectively reasonable." *Id.* at 884. Thus, compared to the attorney-client privilege, the work-product doctrine is broader in that "it is not restricted to solely confidential communications between an attorney and client," yet narrower in that "the doctrine protects only work performed in anticipation of litigation or for trial." *F.T.C. v. Boehringer Ingelheim Pharms., Inc.,* 778 F.3d 142, 149 (D.C. Cir. 2015) ("*Boeringer I*"); *see also Animal Welfare Inst. v. NOAA,* 370 F. Supp. 3d 116, 137 (D.D.C. 2019) ("In contrast to the attorney-client privilege, the work-product doctrine 'does not exist to protect a confidential relationship, but rather to promote the adversary system by safeguarding the fruits of an attorney's trial preparation from the discovery attempts of the opponent.'") (citing *U.S. v. Am. Tel. and Tel. Co.,* 642 F.2d 1285, 1299 (D.C. Cir. 1980)). There are two types of work product — "fact" and "opinion" work product. *See Upjohn Co. v. United States*, 449 U.S. 383, 400–01 (1981). "Opinion work product reveals the 'mental impressions, conclusions, opinions or legal theories of a party's attorney or other representative concerning the litigation' and is 'virtually undiscoverable.'" *English v. Washington Met. Area Transit Auth.*, 323 F.R.D. 1, 15 (D.D.C. 2017) (internal citations omitted). Fact work product, in contrast, can be disclosed if the requesting party "shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain the materials by other means." *Id.*

## DISCUSSION

The PDQs broadly seek information relating to five discrete categories: (1) Authorization, Instructions, and Materials Defendants Gave to Mr. Aronson and How Mr. Aronson's Representation Changed Over Time ("Category A"); (2) the 2009 POC and Amendment Thereto ("Category B"); (3) Mr. Aronson's November 20, 2013 Email to Mr.

Markley ("Category C"); (4) Mr. Aronson's June 18, 2015 Email to Mr. Davenport ("Category D"); and (5) Mr. Aronson's Fees ("Category E").  *See* Defs.' Mem. at 9; Pl.'s Resp. at 8 n.5 (adopting Defendants' categorization and numbering scheme of the PDQS for ease of reference). The Court first addresses whether these categories call for privileged or protected information, and then addresses whether the privilege or protection was waived.

## I.   Whether the PDQs Intrude on the Attorney-Client Privilege or Work Product Doctrine

### A.   Category A PDQs – *Mr. Aronson's Authorization, Instructions, and Representation*

Defendants object that PDQs 1, 2, 3, and 10 are improper to the extent they inquire into whether and when Mr. Aronson needed Defendants' "prior review and [or] approval" before making a filing or communication.  *See* Defs.' Mem. at 10.  Mr. Davenport responds that the general subject matter of an attorney's representation, including the scope of that representation, is not privileged. Whether Mr. Aronson needed Defendants' authorization, Mr. Davenport argues, is not a confidential communication, and its disclosure does not reveal underlying legal advice.  *See* Pl.'s Opp'n at 9–10.

Mr. Davenport correctly asserts that neither the general subject matter nor general purpose of an attorney's representation of a client is typically considered privileged, because that information is generally not confidential.  *U.S. v. Legal Servs. for New York City,* 249 F.3d 1077, 1081 (D.C. Cir. 2001) (holding that data logs identifying case numbers, subject matters of representation, and client names are not privileged because they do not reveal a "confidential professional communication").  Additionally, the attorney-client privilege does not necessarily protect the structure of that relationship, including the broad parameters of an attorney's authority to represent the client.  *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Aetna Cas. & Sur. Co.,* 384 F.2d 316, 317 n.4, 318 (D.C. Cir. 1967) (*"Aetna"*) (finding that a letter authorizing

attorney to "proceed with the defense" was not privileged because it "in no way . . . disclosed the strategy, legal theory, or substance of that defense.").  However, substantive communications between an attorney and client regarding the tasks an attorney will perform for the client, including the client's instructions to the attorney, may be privileged, provided that the client intends that the communications remain confidential and the communications involve the provision of legal advice.  *Cf. Cedrone v. Unity Sav. Ass'n*, 103 F.R.D. 423, 428–30 (E.D. Pa. 1984) (sustaining privilege objection to questions asking attorney about substance of client's instructions and noting that "the specific details of the internal decision making process engaged in by the client and his attorney absent a demonstration to the contrary are clearly protected"). Thus, the applicability of the privilege turns on whether the proposed questions inquire into the existence or general scope of an attorney's representation of a client, or seek disclosures of confidential discussions between the attorney and client regarding how that representation should be carried out.

When applying those principles, courts have determined that the attorney-client privilege does not protect communications in which a client instructs or authorizes an attorney to provide specific documents or information to the court or a third party because "[b]y their very nature these instructions, when carried out, would become public."  *Walker v. American Ice Co.*, 254 F. Supp. 736, 738–39 (D.D.C. 1966).  Such communications are not made "in confidence," as is necessary to invoke the privilege, because the client necessarily intends that they be disclosed.

PDQs 1, 2, 3, and 10 do not merely probe whether an attorney-client relationship existed. Rather, the PDQs seek to define the manner in which the relationship was carried out, including the level of oversight Defendants exercised.  The mere fact that Defendants may have reviewed some communications or filings before Mr. Aronson sent or filed them would not be privileged,

but communications between Defendants and Mr. Aronson about whether and when to conduct that level of review would be.  Defendants have stated that, to the extent they communicated with Mr. Aronson about such matters they intended the communications to remain confidential.  Defs.' Mem. Ex. 2 ("Djourabchi Decl.") ¶ 12, ECF No. 44-2; Defs.' Mem. Ex. 3 ("Welt Decl.") ¶ 12, ECF No. 44-3.   But they do not confirm whether they ever discussed the issue with Mr. Aronson.  *See id.*  If they did not discuss the topic with Mr. Aronson, no privilege applies because no communications are at issue.  *See Upjohn Co.,* 449 U.S. at 395–96.  Thus, the Court partially sustains the attorney-client privilege objections to PDQs 1, 2, 3, and 10.  Defendants may withhold only communications with Mr. Aronson about whether they would authorize the types of communications or filings discussed in those PDQs but must otherwise answer the questions.

Defendants have not submitted sufficient information to sustain their work-product objections to PDQs 1, 2, 3, and 10.  Defendants claim that the answers to those PDQS "necessarily reflect Mr. Aronson's mental impressions as to filings in contested matters or related communications because it signifies the importance Mr. Aronson placed on these actions."  Defs.' Mem. at 11.  But there is no declaration from Mr. Aronson to support that assertion.  Therefore, the Court overrules the work-product objection to PDQs 1, 2, 3, and 10.

For similar reasons, PDQ 5, which asks whether and how Mr. Aronson's need for "prior review or approval" changed over time, and PDQ 6, which asks whether Defendants required "notification" from Mr. Aronson, may implicate privileged information if answering those PDQs requires the disclosure of communications between Defendants and Mr. Aronson.  The degree of Defendants' oversight, along with the fact that it may have changed during the representation, is only privileged if its disclosure would reveal the substance of communications between

Defendants and their attorney.  For example, if Defendants told Mr. Aronson that he could no longer send communications without first seeking their review, that conversation (including the refusal to authorize Mr. Aronson to send communications) is privileged.  Further, asking about "how" Defendants' scrutiny and review of Mr. Aronson's filings and communications changed may implicate the attorney-client privilege if it implicitly reveals substantive attorney-client conversations about the reasons or circumstances that led to the change.  Consequently, the Court partially sustains the attorney-client privilege objection to PDQs 5 and 6.  Defendants shall respond to these PDQs by discussing their oversight of Mr. Aronson and whether it changed over time but may assert the privilege over their conversations with Mr. Aronson about any such change in their oversight.  The work-product objection to PDQs 5 and 6 lacks merit because Defendants have submitted neither an attorney declaration nor other evidence indicating that answering these questions would require disclosing their attorney's mental impressions and strategy.  Consequently, the Court overrules Defendants' work-product objection.

Defendants also object that PDQs 4 and 9, which target changes to the scope of Mr. Aronson's representation overall, are improper to the extent they seek information regarding how Mr. Aronson's representation of Defendants changed over time.  *See* Defs.' Mem. at 11.  PDQ 4 asks how and when the scope of Mr. Aronson's representation changed, and Defendants assert that, by asking Defendants "'how' . . . Defendants would have to disclose *why*," which would implicate confidential communications and mental impressions.  *See id.* at 12 (emphasis in original).  As Defendants seem to acknowledge, however, PDQ 4 does not actually ask "why."  Thus like PDQs 5 and 6, PDQ 4 may not implicant *any* substantive conversation between Mr. Aronson and Defendants about changing the nature of the representation he provided as their attorney.  Further, in contrast to PDQs 5 and 6, PDQ 4 focuses exclusively on the "general

subject matter[]" or scope of the attorney-client relationship and not the specific tasks Defendants allowed Mr. Aronson to perform.  *Legal Servs. for New York City,* 249 F.3d at 1081; *Condon v. Petacque,* 90 F.R.D. 53, 54 (N.D. Ill. 1981).  Defendants concede that the "general purpose" of a client's representation is not usually privileged, and that they have already testified to that information in depositions.  *See* Defs.' Reply at 6.  If the "general purpose" of Mr. Aronson's representation is not protected by the attorney-client privilege or work-product doctrine, subsequent changes to that representation are also not protected.  Thus, the Court overrules the attorney-client privilege objection to PDQ 4.  This question does not implicate Mr. Aronson's mental impressions or legal strategy, and the work-product objection also is overruled.

PDQ 9 asks whether there was a time during a specific period when Mr. Aronson was not authorized to communicate on Defendants' behalf.  This question is similar to the "when" subpart of PDQ 5 and implicates the attorney-client privilege only if answering it requires disclosing confidential conversations between Mr. Aronson and Defendants.  Consequently, the Court partially sustains the attorney-client objection to PDQ 9.  Defendants shall respond to PDQ 9 but may assert the privilege to refuse to disclose their conversations with Mr. Aronson about any changes in his authority to communicate on their behalf.  This question does not implicate Mr. Aronson's mental impressions or legal strategy, and the work product objection is overruled.

In comparison, PDQs 7, 8, and 11 all directly ask "why" Defendants chose to review or not review communications or filings made by Mr. Aronson.  Mr. Davenport does not clearly articulate why those objections should be overruled.  *See* Pl.'s Mem. at 8–14.  Asking "why" Defendants chose to pursue a given course of action, or instruct their attorney in a specific

manner, may reveal case strategy and confidential communications about whether certain filings should be reviewed, thus implicating both the attorney-client privilege and work product protections.  Thus, the Court sustains the objections to PDQs 7, 8, and 11[6]

Defendants object that PDQs 12 and 13 violate attorney-client privilege by improperly inquiring whether Defendants "intended" or "instructed" Mr. Aronson to communicate pay-off amounts to Mr. Davenport's attorney.  *See* Defs.' Mem. 12–13.  Defendants concede that the privilege does not extend to specific communications between Mr. Aronson and opposing counsel, because those communications cannot be confidential.  *See* Defs.' Mem. at 13; Pl.'s Resp. at 12.  Defendants assert, however, that their general "intent and instructions are inextricably intertwined with confidential legal communications."  *See* Defs.' Reply at 8.  Defendants do not assert work-product claims as to PDQs 12 and 13.  *See* Defs.' Mem. at 16.

PDQ 12 asks whether Defendants intended for Mr. Aronson to communicate a payoff amount to Mr. Davenport's attorney, without inquiring "why" or "how" Defendants articulated their intent to their attorney.   Thus, PDQ 12 does not implicate any communications, let alone confidential ones.  *See Upjohn Co.*, 449 U.S. at 395–96 ("The protection of the privilege extends only to *communications* and not facts . . . [the client] may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.") (citing *Philadelphia v. Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962)).  Consequently, the Court overrules Defendants' objection to PDQ 12.

PDQ 13, in contrast, inquires into Defendants' communications with their attorney.  As an initial matter, Defendants' willingness to answer questions regarding specific communications

---

[6]  Given the placement of the objection in the text, the Court believes the objections are limited to the "why" portion of the proposed questions.  *See* Joint Status Report, ECF No. 40 at 2.  The fact that Defendants may have reviewed a court filing is not privileged.

Mr. Aronson made to third parties is not inconsistent with their privilege assertion to PDQs regarding general instructions they gave Mr. Aronson.  By authorizing their attorney to make a specific communication to a third party, Defendants must have intended the information to be conveyed, and could neither have expected nor intended that the communication remain confidential.  *See, e.g.*, *Adams v. Franklin,* 924 A.2d 993, 1000 (D.C. 2007) (finding that information conveyed by a client to an attorney to be included in a demand letter is not privileged, because the client "knew and intended that information to be published").  Inquiry into more general instructions about how closely Defendants would oversee their attorney's communications with the court and opposing counsel, however, potentially implicates confidential instructions that Defendants gave their attorneys, such as the confidential communications that PDQs 1, 2, 3, and 10 may implicate.  Thus, the problem with PDQ 13 is not its area of inquiry, but rather the fact that it is phrased in a way that may implicate both privileged and nonprivileged responses.  To avoid intrusion on the attorney-client privilege, the Court modifies PDQ 13; Defendants shall identify each instance, if any, in which they instructed Mr. Aronson to communicate with a third party regarding a pay-off amount or amount owed to Mr. Markley.

Defendants object that PDQs 14 and 15 improperly inquire into information and calculations Defendants provided to Mr. Aronson for the purpose of obtaining legal advice.  *See* Defs.' Mem. at 13–14.  Defendants do not assert work-product claims as to PDQs 14 and 15. *See* Defs.' Mem. at 16.  Similar to his response regarding PDQ 13, Mr. Davenport responds that the privilege does not apply because the underlying information was shared in bankruptcy filings and other communications, and therefore is not confidential.

As with PDQ 13, PDQs 14 and 15 as phrased may implicate both privileged and non-privileged responses.  As described above, if Defendants instructed Mr. Aronson to make a third-party communication and gave him information for that purpose, the information is not privileged because Defendants could not have intended that the information remain confidential. *See Adams,* 924 A.2d at 1000.  Indeed, Mr. Davenport appears to recognize that the propriety of PDQs 14 and 15 depends on: "*If* Defendants intended or authorized Mr. Aronson to communicate these amounts to a third-party . . . ."  *See* Pl.'s Resp. at 12–13 (emphasis added). Yet Defendants credibly state that they also provided information to Mr. Aronson for the purposes of obtaining legal advice, "before or after" making a communication.  Djourabchi Decl. ¶ 15; Welt Decl. ¶ 15.  In those circumstances, such as an initial case consultation or subsequent strategy discussion, Defendants likely intended the information to remain confidential.  To avoid potentially implicating the privilege, the Court modifies PDQ 14; for each instance identified in PDQ 13, Defendants shall identify any information provided to Mr. Aronson to include in his communications to Mr. Davenport and the Bankruptcy Court, such as calculations, spreadsheets, records, addresses, or other supporting documentation and factual information.  That modification makes PDQ 15 duplicative, and it shall be stricken.

### B.  Category B PDQs – The 2009 POC and Amendment Thereto

Defendants object that PDQ 16 improperly seeks Defendants' confidential calculations, communicated to Mr. Aronson for the purpose of obtaining legal advice.  *See* Defs.' Mem. at 18. Mr. Davenport responds that information conveyed for the purpose of drafting a proof of claim is not privileged, because it was not intended to be confidential.  *See* Pl.'s Resp. at 17 (citing *Adams,* 924 A.2d at 996, 999–1000).  The purpose of Defendants' calculation is not relevant, however, because Defendants' calculations are not communications.  Rather, Defendants'

calculations are underlying facts, and are not entitled to special protection merely because they are later communicated to an attorney. Nor does PDQ 16 ask whether Defendants provided that calculation to Mr. Aronson. Defendants do not assert the work-product protection as to PDQ 16. *See* Defs.' Mem. at 21. Thus, the Court overrules Defendants' objection to PDQ 16.

Defendants object that PDQ 17 improperly seeks Defendants' intent, which would require disclosure of legal advice. As with PDQ 12, Defendants' subjective intent is not a communication, nor does it necessarily reveal an attorney's mental impressions. Thus, the Court overrules Defendants' objection to PDQ 17.

Defendants object that PDQs 18, 19, 22, 23, 24, and 29 improperly seek Defendants' specific instructions to their attorney. *See* Defs.' Mem. at 18. PDQs 18 and 19, which ask whether Defendants instructed Mr. Aronson to make a communication, are duplicative of modified PDQ 13 and are therefore stricken. PDQs 22, 23, 24, and 29 are slightly different however, in that they ask whether Defendants instructed Mr. Aronson to include specific information in his communications. Like PDQ 14, these PDQs may implicate both privileged and non-privileged responses. Whether the privilege applies turns on whether Defendants' answers to these questions simply require sharing the specific communications Mr. Aronson made to third parties at Defendants' direction, or require a discussion of confidential communications with Mr. Aronson about what information, if any, should be shared with third parties, or about how much discretion Mr. Aronson should exercise while litigating the case. *See Adams,* 924 A.2d at 1000. Accordingly, to avoid implicating the privilege, the Court modifies PDQ 22; for each instance identified in PDQ 13, Defendants shall identify any information they instructed Mr. Aronson to include in his communications, such as calculations of the amounts owed under the Note and $10,000 loan, any other amounts based on other

17

communications or independent calculations, or addresses.  That modification makes PDQs 23, 24, and 29 duplicative, and they are stricken.

As with PDQs 14 and 15, Defendants object that PDQs 20, 21, and 25 improperly inquire into information and calculations Defendants conveyed to Mr. Aronson for the purpose of obtaining legal advice.  *See* Defs.' Mem. at 18.  Again, Mr. Davenport responds that information conveyed to Mr. Aronson for a bankruptcy court filing or third-party communication is not confidential, and therefore not privileged.  For similar reasons as discussed above, the PDQs may implicate both privileged and non-privileged responses.  Because the Court has modified PDQ 14 to avoid implicating the attorney-client privilege, PDQs 20, 21, and 25 become duplicative; they are therefore stricken.

Defendants object that PDQs 26, 27, 33, and 34 improperly seek to discover how Defendants reacted to Mr. Aronson's allegedly unauthorized communications, specifically whether Defendants told Mr. Aronson he was "unauthorized" to make certain filings and whether and how Defendants changed their instructions to Mr. Aronson. [7]  *See* Defs.' Mem. at 19.  PDQs 26 and 33 directly ask for the content of Defendants' conversations with their attorney about the manner in which he handled the litigation, specifically his allegedly unauthorized filing of the proof of claim and amended proof of claim.  A denial that Defendants ever discussed the topic of the unauthorized filings with Mr. Aronson is the only potential answer that would not reveal privileged attorney-client communications, because in that circumstance there would be no underlying communications to disclose.  However, Defendants have stated that they discussed the proof of claim and amended proof of claim with Mr. Aronson and intended that those

---

[7] In Category B, Defendants also raise work-product objections to PDQs 27, 33, and 34. Because the Court sustains the objections to those PDQS on attorney-client privilege grounds, it does not address the work-product arguments.

conversations be kept confidential.  *See* Djourabchi Decl. ¶ 17; Welt Decl. ¶ 17.  Accordingly, the Court sustains the objections to PDQs 26 and 33.  PDQs 27 and 34 inquire into whether and how Defendants changed their instructions or procedures regarding "prior review or approval" of Mr. Aronson's filings and communications.  Asking how the instructions changed implicates the attorney-client privilege because it encompasses communications between Defendants and Mr. Aronson, namely discussions in which Defendants conveyed those instructions to Mr. Aronson. Asking whether the instructions changed does not necessarily implicate the privilege,  for the reasons explained regarding PDQs 1, 2, and 3.  Thus the Court sustains the objections to PDQs 27 and 34 in part.  Defendants may withhold communications in which they told Mr. Aronson how to carry out the legal representation, but must otherwise answer the questions.

Defendants object that PDQs 28 and 35 improperly seek steps taken by Defendants to correct the 2009 POC and the resulting amendment, including those prompted by the advice of counsel.  *See* Defs.' Mem. at 20–21.  Defendants assert that responding to the PDQs would require disclosing confidential legal advice because "Defendants do not agree that any 'correction' was required to expressly include arrears."  *Id.*  PDQs 28 and 35 do not ask Defendants to explain "whether" or "why" a correction was required; PDQs 28 and 35 only ask "what" steps, if any, Defendants took.  To the extent those corrective steps were not instructions to their attorney, no communications are implicated.  Thus, the objections to PDQs 28 and 35 are overruled, except that Defendants may decline to disclose remedial communications with their attorney.

Defendants object that PDQs 30, 31, and 32 improperly require Defendants to identify information or instructions they provided to Mr. Aronson concerning amending their proof of claim.  As with PDQs 14 and 22, the PDQs may implicate both privileged and non-privileged

responses.  To the extent Defendants provided such information or instructions for the purposes

of filing an amended proof of claim, there could be no intention of confidentiality.  Having

modified PDQs 14 and 22 to avoid implicating attorney-client privilege, PDQs 30 and 31

become duplicative and are stricken.  Mr. Davenport has not directly responded to Defendants'

objection to PDQ 32, which inquires into an area likely to involve attorney-client

communications or work product.  Accordingly, the Court sustains Defendants' unopposed

objection to PDQ 32.

C.  *Category C – The November 20, 2013 Email*

Category C relates to an email sent on November 20, 2013 from Defendants' attorney,

Mr. Aronson, to Mr. Davenport's attorney, Mr. Markley.  The email identifies a balance due on

the Note, and Defendants have denied reviewing or authorizing the email.  *See* Defs.' Mot. at 24.

Defendants object that PDQ 36 improperly inquires into Defendants' "intent" with

respect to certain calculations they made in late November 2013, which would require disclosing

confidential legal communications with their attorney.  *See* Defs.' Mem. at 24.  As described

above with reference to PDQs 12 and 17, Defendants' subjective intent is not a communication.

Because Defendants do not raise work-product objections here, it is irrelevant whether PDQ 36

reveals their attorney's mental impressions.  Thus, the Court overrules the objection to PDQ 36.

Defendants object that PDQs 37 and 41 improperly inquire into information Defendants

"provided" to their attorney to obtain legal advice—here the November 2013 calculations.  *See*

Defs.' Mem. at 24–25.  As described above in reference to PDQ 14, these PDQs implicate both

privileged and non-privileged responses.  To the extent Defendants provided such information so

that Mr. Aronson could include it in an authorized communication with a third party, there could

be no intention of confidentiality.  Having modified PDQ 14, PDQs 37 and 41 are duplicative and are stricken.

Defendants object that PDQs 38, 39, and 40 improperly inquire into Defendants' "instructions" to their attorney relating to the November 2013 email.  *See* Defs.' Mem. at 25.  As described above in reference to PDQ 22, PDQs 38 and 39 may implicate both privileged and non-privileged responses.  Whether the privilege applies depends upon whether Defendants authorized a disclosure, and whether they instructed their attorney to disclose specific information.  Having modified PDQ 22, the non-privileged portions of PDQs 38 and 39 are duplicative and therefore these questions are stricken.  However, PDQ 40 asks whether Defendants told their lawyer to perform his own calculations of the payout amount.  That directly seeks the content of communications between Defendants and Mr. Aronson, and is privileged.  Accordingly, the Court sustains the objections to PDQ 40.

Defendants object that PDQ 42 improperly asks whether Defendants told Mr. Aronson that he was not authorized to send the November 2013 email, and whether Defendants' interactions with Mr. Aronson changed after it was sent.  *Id.*  As with PDQs 26 and 33, any reprimand would be a confidential communication for the purposes of Defendants' legal representation, and therefore privileged.  Thus, the Court sustains the objection to PDQ 42.

Defendants object that PDQ 43 improperly inquires into whether Defendants required "prior review or approval," and whether that changed over the course of the representation.  *Id.* at 26.  This question is nearly identical to PDQ 5, and implicates privileged communications for the reasons discussed above.  Thus, the objection to PDQ 43 is sustained in part.

Defendants object that PDQ 44 improperly inquires into Defendants' corrective steps, which may include confidential communications to counsel.  *See id.*  As with PDQs 28 and 35,

"steps" taken by Defendants may include privileged communications, but may also include other remedial actions. Thus, the Court overrules the objection to PDQ 44, except that Defendants may decline to disclose remedial communications with their attorney.

### D.  Category D: Mr. Aronson's June 18, 2015 Email to Mr. Davenport

The Category D PDQs relate to an email sent on June 18, 2015 from Mr. Aronson to Mr. Davenport. These PDQs are largely identical to the Category C PDQs, except that they refer to a different document. Defendants raise the same objections. *See* Defs.' Mem. at 28 ("For the same reasons as Category C . . . Defendants' Privilege Objections should be sustained."). Accordingly, the Court's analysis and rulings are also identical. The objection to PDQ 45 is overruled; PDQs 46 and 50 are duplicative of modified PDQ 14 and are therefore stricken; PDQs 47 and 48 are duplicative of modified PDQ 22 and are therefore stricken; the objections to PDQs 49 and 51 are sustained; the objection to PDQ 52 is sustained in part; and the objection to PDQ 53 is overruled, except that Defendants may decline to disclose remedial communications with their attorney.

### E.  Category E – Mr. Aronson's Fees

Category E relates to a single PDQ that asks "whether Defendants disputed fees with Mr. Aronson for work related to actions that Defendants claim was unauthorized." *See* Defs.' Mem. at 29. Whether Defendants disputed fees with their attorney, and the nature of that dispute, may be a confidential communication relating to Defendants' legal representation, and therefore privileged. However, the Court need not pause long on this objection; even assuming the PDQ seeks privileged information, the privilege has been waived for the reasons explained below.

**II. Whether Defendants Waived the Attorney-Client Privilege**

Mr. Davenport asserts that Defendants have waived the attorney-client privilege by putting Mr. Aronson's authorization to perform certain tasks "at-issue," and by selectively disclosing privileged material relating to Mr. Aronson's lack of authorization. *See* Pl.'s Resp. at 24. Defendants reply that they have not put Mr. Aronson's authorization at issue, because Defendants have only responded to Mr. Davenport's deposition questions. *See* Defs.' Reply at 17. Defendants also assert that they have not selectively disclosed privileged material, because they have only responded with non-privileged information. *Id.* at 19.

*A. Whether Defendants Have Put Privileged Information "At-Issue"*

In *Wender,* the D.C. Court of Appeals explained that "[a]n important consideration in assessing the issue of waiver is fairness." 434 F.2d at 1374 (citing *Handgards, Inc. v. Johnson & Johnson,* 413 F. Supp. 926, 929 (N.D. Cal. 1976)). A party waives privilege by relying on the advice of counsel as a defense, because "it would be unfair, without furthering the purpose for which [the privilege] was intended, to sustain application of the attorney-client privilege" when a party uses the words of their counsel as a sword and simultaneously uses privilege as a shield. *Id.* Those fairness concerns, and consequently waivers of the privilege, are not limited to reliance on advice of counsel as an affirmative defense; they also apply wherever "the party resisting discovery raised as a defense that which transpired between client and counsel." *Id.* (citing *Barr Marine Products Co. v. Borg-Warner Corp.,* 84 F.R.D. 631, 635 (E.D. Pa. 1979)).

In determining whether fairness mandates a waiver, the D.C. Court of Appeals relied on *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975). Under the three-factor *Hearn* standard, the attorney-client privilege is waived where:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party;

> (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and
>
> (3) application of the privilege would have denied the opposing party access to information vital to his defense.  Where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

*Wender,* 434 A.2d at 1374 (citing *Hearn,* 68 F.R.D. at 581).

Defendants recognize that the D.C. Court of Appeals relied on *Hearn,* but nonetheless assert that this Court should apply the "*Rhone* standard" instead.  *See* Defs.' Reply at 16–17 n.16. Under *Rhone,* the privilege is not waived unless "the client asserts a claim or defense, *and attempts to prove that claim or defense by disclosing or describing an attorney client communication*."  *Rhone-Poulenc Rorer, Inc. v. Home Indemnity Company,* 32 F.3d 851, 863 (3d Cir. 1994) (emphasis added) (internal citation omitted).

The Court will apply *Wender,* and by extension *Hearn.*  As noted above, the D.C. Court of Appeals discussed the *Hearn* standard with approval in *Wender.  Wender,* 434 A.2d at 1981. The D.C. Court of Appeals has also continued to follow the waiver rules set forth in *Wender,* even after the Third Circuit announced the *Rhone* standard, and courts in this District have generally followed suit.  *See, e.g.*, *Adams,* 924 A.2d at 999; *see also Feld v. Fireman's Fund Ins. Co.,* 292 F.R.D. 129, 141 (D.D.C. 2013) (applying *Hearn* because, while "relevance cannot be the sole benchmark for determining implied waiver," the waiver is limited to where fairness requires it).  *But see Trustees of Elec. Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc.*, 266 F.R.D. 1, 13 (D.D.C. 2010) (applying *Rhone* because "if *Hearn* is right and relevancy is the only criterion to consider, then in this case counsel's giving advice and his clients' relying on it would in itself constitute a waiver of the confidentiality of that advice even though plaintiffs are predicating neither a claims [sic] or a defense on that advice").

Some courts have expressed concern that *Hearn's* relevance test is broad, unpredictable, and ultimately undermines the purposes the privilege is meant to serve.  *See Rhone,* 32 F.3d at 864 ("Furthermore, because the definition of what may be relevant and discoverable from those consultations may depend on facts and circumstances of as yet unfiled litigation, the client will have no sense of whether the communication may be relevant to some future issue, and will have no sense of certainty or assurance that the communication will remain confidential."); *In re Cty. Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("But privileged information may be in some sense relevant in any lawsuit.  A mere indication of a claim or defense certainly is insufficient to place legal advice at issue.").  The D.C. Court of Appeals, however, has repeatedly stressed that D.C.'s waiver rules are fundamentally rooted in "fairness."  *See, e.g., Adams,* 924 A.2d at 999 ("An important consideration in assessing the issue of waiver is fairness.") (citing *Wender,* 434 A.2d at 1374); *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 551 (D.C. 1981) ("To sustain selective waiver of an attorney-client privilege for tactical purposes would be unseemly, if not demonstrably unfair.").  Fairness thus limits the breadth of *Hearn's* relevance prong.  D.C. law's emphasis on "fairness" also conflicts with *Rhone's* more rigid, mechanical test.  Thus, this Court concludes that *Hearn*, and not *Rhone,* is the appropriate standard under D.C. law.

Under the *Hearn* standard, Defendants have only waived the attorney-client privilege if they "put the protected information at issue" through some "affirmative act."  *Wender,* 434 A.2d at 1374 (citing *Hearn,* 68 F.R.D. at 581).  Mr. Davenport asserts that Defendants have injected the supposedly protected communications into the case through their interrogatory responses and deposition testimony suggesting the Aronson documents were erroneous and unauthorized.  *See* Pl.'s Resp. at 24.  Mr. Davenport asserts that these arguments raise an affirmative defense.  *See* Pl.'s Resp. at 25; Pl.'s Sur-Reply at 15.  Defendants assert that they have not waived their

privilege because they "have not taken an affirmative act to put any privileged material at issue." *See* Defs.' Reply at 18.

*Feld v. Fireman's Fund Insurance Company* is illustrative of how a party may place otherwise privileged information at issue in a case. 292 F.R.D. at 134 ("*Feld I*"). In *Feld,* an insured sought to recover legal expenses from his insurance carrier, after the carrier denied reimbursement on the basis that the billing rates had not been approved. *See id.* The insured claimed that his discussions with his attorneys regarding the hourly rates were privileged, and the privilege was not forfeited because he did not intend to use any attorney- client communications to prove his case. *Id.* at 139–40. The insured did, however, assert that he and his insurer had never agreed to any hourly rates. *Id.* at 140. Thus, the court, applying D.C. law and *Hearn*, found that "[b]y filing this action and alleging that neither he nor [his attorneys] agreed to rates . . . [the insured] has placed his attorney-client communications at issue." *Id.* "[The insurer] is entitled to explore what [the attorneys] told [the insured] about [the insurer's] position . . . and how [the insured] directed his attorneys to act." *Id.* (internal citation omitted). In a subsequent opinion, later affirmed by the D.C. Circuit, the same court held that the carrier had not placed *its* communications with *its* attorneys at issue, because a party's response to an allegation "cannot put at issue questions that were already there." *Feld v. Fireman's Fund Ins. Co.,* 12-cv-1789 (JDB), 2014 WL 1279554 at *1 (D.D.C. Dec. 19, 2014) ("*Feld II*"), *aff'd* 909 F.3d 1186, 1199 (D.C. Cir. 2018) ("*Feld III*").

### 1. Defendants' Claim for Attorney's Fees

Defendants have waived their privilege objection as to questions regarding Mr. Aronson's fees. Defendants "have asserted entitlement to Mr. Aronson's attorneys' fees incurred after Mr. Davenport's Second [Bankruptcy] Case in this proceeding [as well as a separate

proceeding].”  Defs.’ Mem. at 29.  Thus, like the insured in *Feld I,* Defendants have clearly put

Mr. Aronson’s fees at issue.  *See Feld I,* 292 F.R.D. at 140 (“By filing this action and alleging

that neither he nor [his attorney] agreed to rates, [the insured] has placed his attorney-client

communications at issue.”).  Whether Defendants disputed those fees with Mr. Aronson is

relevant to whether the fees were reasonable.  Fairness dictates that Mr. Davenport be permitted

to explore whether Defendants themselves questioned the reasonableness of the fees they seek to

recover.  *See id.* at 141 (“Fairness requires that the privilege give way to [the carrier’s] right to

access the communications at issue to defend against [the insured’s] claim.”); *see also Ideal*

*Elec. Sec. Co., Inc. v. International Fidelity Ins. Co.,* 129 F.3d 143, 151 (D.C. Cir. 1997) (“Ideal

is entitled to discover the information it requires to appraise the reasonableness of the amount of

fees requested by IFIC, including the nature and extent of the work done by IFIC’s counsel on

various phases of the case, so that it may present to the court any legitimate challenges to IFIC’s

claim.”).  Thus, Defendants’ objection to the Category E PDQ relating to Mr. Aronson’s fees is

overruled as waived.

        2.  <u>Defendants’ Assertion That Their Counsel Lacked Authority to Take<br>Certain Actions</u>

Defendants’ waiver of the privilege regarding fees does not extend to waive the privilege

regarding the scope of Mr. Aronson’s authority.  If an assertion that an agent acted without

authority is an affirmative defense, then Defendants’ position is analogous to the insured in *Feld*

*I* and they have placed the scope of the attorney’s authority at issue.  *See also Wender,* 434 A.2d

at 1374 (holding affirmative defense of reliance on the advice of counsel waives the privilege);

*Berliner Corcoran & Rowe LLP v. Orian,* 662 F. Supp. 2d. 130, 135 (“Defendants put the issue

of Plaintiff’s representation before this Court when they filed their counterclaims [against their

attorney].”).  If an assertion that an agent acted without authority is not an affirmative defense,

then Defendants are similarly situated to the carriers in *Feld II* and *Feld III*, and Defendants have

not necessarily placed the attorney's authority at issue, because Defendants have only responded

to issues already injected by Mr. Davenport when he filed his claim.

Defendants have not pled Mr. Aronson's lack of authority as an affirmative defense in

their Answer.[8]  *See generally* Answer, ECF No. 29.  Defendants have also not sought leave to

amend their Answer to add an affirmative defense.[9]  While a party cannot assert the privilege as

*both* a sword and a shield, a party clearly remains free to forego a claim or defense to safeguard

their privilege, as Defendants may have done here.

### B.  Whether Defendants Have Selectively Disclosed Privileged Material

"A party asserting attorney-client privilege cannot be allowed, after disclosing as much as

he pleases, to withhold the remainder."  *In re Kellog Brown & Root, Inc.*, 796 F.3d 137, 145

(D.C. Cir. 2015).  Mr. Davenport asserts that Defendants, through their deposition testimony,

have selectively disclosed privileged communications, and thus waived the privilege.[10]  *See* Pl.'s

Resp. at 26.  Mr. Davenport points to Defendants' deposition testimony "that various

communications were unauthorized, unsupervised and inaccurate" as well as "a single post

---

[8] The failure to raise the affirmative defense may waive it.  *Harris v. Secretary of Dep't of Veterans Affairs,* 126 F.3d 339, 345 (D.C. Cir. 1997) ("[A] party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion.").

[9] Should Defendants choose to do so, the privilege would almost certainly be waived under *Hearn* and *Wender*.  Further, Defendants' assertion of the privilege here may weigh against granting leave to amend an answer, as asserting the affirmative defense would prejudice Mr. Davenport.  The Court need not, however, decide these issues at this time, as they go beyond the scope of the referral and are not before the Court.

[10] Mr. Davenport asserts that Defendants have waived both attorney-client privilege and work product protection.  *See* Pl. Resp. at 26.  Attorney client and work product waivers should be examined separately because they raise distinct legal issues.  *See Kellogg Brown & Root*, 796 F.3d at 145.  However, as the Court's rulings upholding the privilege are all based on attorney-client privilege, it is unnecessary to address work product.

communications spreadsheet." *Id.*  Defendants reply that their testimony revealed only non-privileged information.  *See* Defs.' Reply at 20.

Mr. Davenport contends that Defendants' testimony about their attorney's authorization to send "specific" documents conflicts with their assertion of the privilege as to documents "generally," and thus constitutes a selective disclosure of privileged information  *See* Pl.'s Sur-Reply at 20 (asserting "Defendants cannot have it both ways").  However, as the Court has already discussed in modifying PDQs 13, 14, and 22, answering questions about Mr. Aronson's "general" authority to perform certain tasks, or the instructions or information Defendants gave him, potentially intrudes on confidential attorney-client communications in a way that discussing the communications in which Defendants told Mr. Aronson to give specific information to the Court or a third party do not.  Further, although Defendants' communications with their attorney about the spreadsheet identified by Mr. Davenport would be privileged, there is no basis to believe that the spreadsheet itself is privileged; it is simply a document containing underlying facts that was transmitted to an attorney.  Thus, Defendants have not disclosed any privileged information, selectively or otherwise, and have not waived the attorney-client privilege.

### III. Defendants' Overbreadth Objection

Although framed in their Memorandum as only a "Reservation of Objection," Defendants appear to object to the breadth and number of the PDQs and "the financial burden of any re-opened deposition."  *See* Defs.' Mem. at 30.  Defendants also assert that Mr. Davenport has used most, but not all, of the time allowed for depositions.  *Id.*  Defendants do not explain, however, why permitting Mr. Davenport to ask the PDQs in the remainder of his allowable time would be unduly burdensome.  *See Alexander v. F.B.I.,* 194 F.R.D. 316, 325–26 (D.D.C. 2000) ("Once the relevance of the material sought has been established, the party objecting to that discovery then

bears the burden of showing why discovery should not be permitted.") (citations omitted).  Thus,

there appears to be no issue for the Court to resolve regarding the scope and number of the

PDQs.  Mr. Davenport may pose the modified PDQs within his allotted seven hours; if Mr.

Davenport believes that more time is needed, under Federal Rules of Civil Procedure 26(b)(1)

and (2) Mr. Davenport may make a motion.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court hereby SUSTAINS Defendants' Objections to PDQs

1–3, 5–11, 26–27, 32–34, 40, 42–43, 49, and 51–52, with PDQs 1, 2, 3, 5, 6, 9, and 10, 27, 34,

43 and 52 sustained in part; OVERRULES Defendants' Objections to PDQs 4, 12, 16–17, 36,

and 45; OVERRULES Defendants' Objections to PDQs 28, 35, 44, and 53, with the exception

that Defendants may decline to disclose remedial communications with their attorney;

MODIFIES PDQs 13–14, and 22; STRIKES PDQs 18 and 19 as duplicative of modified PDQ

13; STRIKES PDQs 15, 20– 21, 25, 30, 37, 41, 46 and 50 as duplicative of modified PDQ 14;

STRIKES PDQs 23, 24, 29, 31, 38–39, and 47–48 as duplicative of modified PDQ 22; and

OVERRULES Defendants' Objection to PDQ 54 as waived.

DATED: November 30, 2020        _____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| PDQ | Question | Summary of the Court's Ruling |
|---|---|---|
| | | **CATEGORY A** |
| 1 | Did you authorize Aronson to communicate with Davenport (or his counsel) or the Bankruptcy Court, including making filings, on Your behalf, without Your prior review and approval? | **Sustained in part**. Whether Defendants required "prior review and approval" may implicate confidential communications regarding Mr. Aronson's representation and legal strategy. Defendants may properly withhold only communications with Mr. Aronson about whether they would authorize the types of communications or filings implicated by the PDQ, but otherwise must answer the question. |
| 2 | What types of communications or filings was Aronson authorized to make without Your prior review or approval? | **Sustained in part**. Whether Defendants required "prior review and approval" may implicate confidential communications regarding Mr. Aronson's representation and legal strategy. Defendants may properly withhold only communications with Mr. Aronson about whether they would authorize the types of communications or filings implicated by the PDQ, but otherwise must answer the question. |
| 3 | What types of communications or filings was Aronson **un**authorized to make without Your prior review or approval? | **Sustained in part**. Whether Defendants required "prior review and approval" may implicate confidential communications regarding Mr. Aronson's representation and legal strategy. Defendants may properly withhold only communications with Mr. Aronson about whether they would authorize the types of communications or filings implicated by the PDQ, but otherwise must answer the question. |
| 4 | Did the scope of Aronson's representation of You change over time? How **Privilege Objection** /when? | **Overruled**. Inquiry into "how" Mr. Aronson's representation changed is limited to the general subject matter of his representation. |
| 5 | Did Aronson's authorization to communicate or file documents on your behalf without Your prior review or approval change over time? How/when? | **Sustained in part**. Whether Defendants' role in "prior review and approval" changed over time may implicate confidential communications regarding Mr. Aronson's representation and legal strategy. Defendants may properly withhold only communications with Mr. Aronson discussing any change in oversight, but otherwise must address |

| | | their degree of oversight and whether it changed over time. |
|---|---|---|
| 6 | Did You require that Aronson notify You after he communicated or filed a document on Your behalf? How long after? Did these notifications include copies of the communications and/or filings? | **Sustained in part**. Whether Defendants required "prior review and approval" may implicate confidential communications regarding Mr. Aronson's representation and legal strategy. Defendants may properly withhold only communications with Mr. Aronson about whether they would authorize any filings implicated by the PDQ, but otherwise must address their oversight of Mr. Aronson and whether it changed over time. |
| 7 | Did You ever review communications by Aronson or documents filed on Your behalf after Aronson sent or filed them? Generally when? Why? **Privilege Objection** | **Sustained**. Mr. Davenport fails to raise a specific opposition.  The PDQ also implicates Mr. Aronson's legal advice and case strategy. |
| 8 | Did You ever review filings made in the Bankruptcy Court on Your behalf after they were filed? When? Why? **Privilege Objection** | **Sustained**. Mr. Davenport fails to raise a specific opposition.  The PDQ also implicates Mr. Aronson's legal advice and case strategy. |
| 9 | After Aronson filed the Proof of Claim in 2009, and prior to your termination of Aronson as Your attorney, was there ever a time when Aronson was not authorized by You to communicate on Your behalf with Davenport or Davenport's attorney, or with the Bankruptcy Court? | **Sustained in part**. Inquiry into "how" Mr. Aronson's representation changed only implicates privilege if Defendants' answers would disclose confidential conversations between Mr. Aronson and Defendants. Defendants may assert the privilege to protect those conversations discussing changes in Mr. Aronson's authority to communicate on their behalf, but otherwise must answer the question, as their answers will not go beyond the general scope of Mr. Aronson's representation. |
| 10 | Your authorization of Aronson included providing to Markley information regarding the amounts You believed Davenport owed? **Privilege Objection** Pay-off quotes? **Privilege Objection** Via email? Via letter? Verbally? | **Sustained in part**. Whether Defendants required Mr. Aronson to convey specific information, and how, may implicate confidential communications regarding Mr. Aronson's representation and legal strategy. Defendants may withhold only confidential communications with Mr. Aronson, but must otherwise answer the question. |
| 11 | Did You review such communications by Aronson to Markley prior to Aronson transmitting the communication? Why or why not? **Privilege Objection** | **Sustained**.  Mr. Davenport fails to raise a specific opposition.  The PDQ also implicates Mr. Aronson's legal advice and case strategy. |

| 12 | Did You intend that Aronson would communicate a pay-off amount or amount owed to Markley? | **Overruled**. Defendants' "intent" does not require disclosure of communications. |
|---|---|---|
| 13 | Did You instruct Aronson to communicate a pay-off amount or amount owed to Markley? | **Modified**.   Defendants shall identify each instance, if any, they instructed Mr. Aronson to communicate a pay-off amount or amount owed to a third-party and Mr. Aronson made that communication. Instances identified in PDQ 13 are authorized communications with no intention of confidentiality. |
| 14 | Did You provide Your calculations of the amount owed or pay-off amount to Aronson? | **Modified**.  For each instance identified in PDQ 13, Defendants shall identify any information provided to Mr. Aronson to include in his communications, such as calculations, spreadsheets, records, addresses, or other supporting documentation and factual information. Instances identified in PDQ 13 are authorized communications with no intention of confidentiality. |
| 15 | Did You provide Aronson the updated spreadsheet/records or any other documents tracking Davenport's payments and the amounts You believed were owed? When? | Duplicative of Modified PDQ 14. |
| **CATEGORY B** |||
| 16 | What were those amounts [that You believe Davenport owed you on the Note?  On the $10,000 loan]? | **Overruled**.   Defendants' calculations are not communications subject to the privilege. |
| 17 | Did You intend that your calculations of the amounts allegedly owed to You Davenport would be filed in a Proof of Claim with the Bankruptcy Court? **Privilege Objection** Or otherwise communicated to any person or entity other than Your attorney, such as to Davenport? | **Overruled**.    Defendants' subjective "intent" does not require disclosure of a confidential communication or their attorney's mental impressions. |
| 18 | Did you instruct Aronson to communicate to any other person or entity the amounts You believed were owed? | Duplicative of Modified PDQ 13. |
| 19 | Did you instruct Aronson to file a Proof of Claim on Your behalf? | Duplicative of Modified PDQ 13. |

| 20 | Did You provide Aronson Your calculations of the amount of money that You believed Davenport owed you on the Note? On the $10,000 loan? | Duplicative of Modified PDQ 14. |
|----|----|----|
| 21 | Did You provide Aronson the spreadsheet/records or any other document tracking Davenport's payments and the amounts You believed were owed When? | Duplicative of Modified PDQ 14. |
| 22 | Did You instruct Aronson to include in a Proof of Claim Your calculations of the amounts owed under the Note and $10,000 loan? | **Modified**.  For each instance identified in PDQ 13, Defendants shall identify any information they instructed Mr. Aronson to include in his communications, such as calculations of the amounts owed under the Note and $10,000 loan, any other amounts based on other communications or independent calculations, or addresses.  Information identified in PDQ 22 is part of an authorized communication with no intention of confidentiality. |
| 23 | Did You instruct Aronson to claim a different amount was owed on the Note than the amount that was listed on the Proof of Claim? | Duplicative of Modified PDQ 22. |
| 24 | Did You instruct Aronson to calculate the amounts to be included on the Proof of Claim without input from You? | Duplicative of Modified PDQ 22. |
| 25 | What supporting documentation did You provide to Aronson for the purposes of calculating the amounts of the claim to be filed in the Bankruptcy Court? What other factual information? | Duplicative of Modified PDQ 14. |
| 26 | After learning that this allegedly unauthorized Proof of Claim had been filed, did You tell Aronson that he had not been authorized to make the filing on Your behalf? | **Sustained**.  Defendants' communications with Mr. Aronson regarding unauthorized conduct are confidential communications made for the purposes of legal representation. |
| 27 | Did You change Your instructions to or procedures with Aronson regarding Your review and approval of communications, documents, or filings before they were transmitted by Aronson on Your behalf? How so? | **Sustained in part**. Whether Defendants' role in "review and approval" changed over time may implicate confidential communications regarding Mr. Aronson's representation and legal strategy, and therefore Defendants may withhold communications in which they gave Mr. Aronson instructions about |

| | | |
|---|---|---|
| | | how to carry out his representation. Otherwise, Defendants must answer the question. |
| 28 | What steps, if any, did You take to correct the amounts stated in the Proof of Claim? When? | **Overruled.** Steps taken by Defendants are not necessarily communications; nor does the PDQ inquire "why" Defendants took those steps. Defendants are free to assert the attorney-client privilege to the extent "steps taken" include confidential communications with their attorney. |
| 29 | Did You instruct Aronson to claim a different amount was owed on the Note than the amount that was listed on the Amended Proof of Claim? | Duplicative of Modified PDQ 22. |
| 30 | Did You communicate to Aronson the two address changes? | Duplicative of Modified PDQ 14. |
| 31 | Did You instruct Aronson to Amend the Proof of Claim, Dep. Ex. 98, to fix the two addresses? | Duplicative of Modified PDQ 22. |
| 32 | Do You have any knowledge or information as to who noticed the two address mistakes in the original Proof of Claim prior to the filing of the Amended Proof of Claim? What knowledge/information? | **Sustained.** Mr. Davenport raises no specific response to Defendants' objection and the question inquires into an area likely to involve attorney-client communications or work product. |
| 33 | After learning that this allegedly unauthorized Amended Proof of Claim had been filed, did You tell Aronson that he had not been authorized to make the filing on Your behalf? | **Sustained.** Defendants' instructions regarding unauthorized conduct are confidential communications made for the purposes of legal representation. |
| 34 | Did You change Your instructions to or procedures with Aronson regarding Your review and approval of communications, documents, or filings before they were transmitted by Aronson on Your behalf? How so? | **Sustained in part.** Whether Defendants' role in "review and approval" changed over time may implicate confidential communications regarding Mr. Aronson's representation and legal strategy, and therefore Defendants may withhold communications in which they gave Mr. Aronson instructions about how to carry out his representation. Otherwise, Defendants must answer the question. |
| 35 | What steps, if any, did You take to correct the amounts stated in the Amended Proof of Claim? When? | **Overruled.** Steps taken by Defendants are not necessarily communications; nor does the PDQ inquire "why" Defendants took those steps. Defendants are free to assert the attorney-client privilege to the extent "steps taken" include confidential communications with their attorney. |
| **CATEGORY C** | | |

| 36 | Did You intend your calculation [of a pay-off quote around November 20, 2013] to be transmitted to Markley? | **Overruled**.  Defendants' intentions are not confidential communications and do not reveal their attorney's mental impressions. |
|---|---|---|
| 37 | Did You provide that pay-off quote or amount owed to Aronson? In what form? Updated spreadsheet/records or other documents? | Duplicative of Modified PDQ 14. |
| 38 | Did You instruct Aronson to transmit the pay-off quote that You calculated to Markley? | Duplicative of Modified PDQ 22. |
| 39 | Did You instruct Aronson to transmit to Markley a different amount owed on the Note? A different pay-off quote? | Duplicative of Modified PDQ 22. |
| 40 | Did You instruct Aronson to calculate the pay-off amount on his own? | **Sustained**.      The question seeks Defendants' confidential communications with Mr. Aronson. |
| 41 | What supporting documentation did You provide to Aronson for the purposes of calculating the pay-off amount to be transmitted to Markley? What other factual information? | Duplicative of Modified PDQ 14. |
| 42 | After learning that this allegedly unauthorized email had been transmitted, did You tell Aronson that he had not been authorized to send the email on Your behalf? | **Sustained**.  Defendants' instructions regarding unauthorized conduct are confidential communications made for the purposes of legal representation. |
| 43 | Did You change Your instructions to or procedures with Aronson regarding Your review and approval of communications, documents, or filings before they were transmitted by Aronson on Your behalf? How so? When? | **Sustained in part**. Whether Defendants' role in "review and approval" changed over time may implicate confidential communications regarding Mr. Aronson's representation and legal strategy, and therefore Defendants may withhold communications in which they told Mr. Aronson how to carry out his representation.  Otherwise, Defendants must answer the question. |
| 44 | What steps, if any, did You take to correct the pay-off amount stated in this email? When? | **Overruled**.  Steps taken by Defendants are not necessarily communications; nor does the PDQ inquire "why" Defendants took those steps.  Defendants are free to assert the attorney-client privilege to the extent "steps taken" include confidential communications with their attorney. |
| **CATEGORY D** | | |
| 45 | Did You intend your calculation to be transmitted to Davenport? | **Overruled**.  Defendants' intentions are not confidential communications and do not reveal their attorney's mental impressions. |

| 46 | Did You provide that pay-off quote or amount owed to Aronson? In what form? Updated spreadsheet/records? | Duplicative of Modified PDQ 14. |
|---|---|---|
| 47 | Did You instruct Aronson to transmit the pay-off quote that You calculated to Davenport? | Duplicative of Modified PDQ 22. |
| 48 | Did You instruct Aronson to transmit to Davenport a different amount owed on the Note? A different pay-off quote? | Duplicative of Modified PDQ 22. |
| 49 | Did You instruct Aronson to calculate the pay-off amount on his own? | **Sustained**. The question seeks Defendants' confidential communications with Mr. Aronson. |
| 50 | What supporting documentation did You provide to Aronson for the purposes of calculating the pay-off amount to be transmitted to Davenport? What other factual information? | Duplicative of Modified PDQ 14. |
| 51 | After learning that this allegedly unauthorized email had been transmitted, did You tell Aronson that he had not been authorized to send the email on Your behalf? | **Sustained**. Defendants' instructions regarding unauthorized conduct are confidential communications made for the purposes of legal representation. |
| 52 | Did You change Your instructions to or procedures with Aronson regarding Your review and approval of communications, documents, or filings before they were transmitted by Aronson on Your behalf? How so? When? | **Sustained** in part. Whether Defendants' "review and approval" changed over time may implicate confidential communications regarding Mr. Aronson's representation and legal strategy. Therefore Defendants may withhold communications in which they told Mr. Aronson how to carry out his representation but otherwise must answer the question. |
| 53 | What steps, if any, did You take to correct the pay-off amount stated in this email? When? | **Overruled**. Steps taken by Defendants are not necessarily communications; nor does the PDQ inquire "why" Defendants took those steps. Defendants are free to assert the attorney-client privilege to the extent "steps taken" include confidential communications with their attorney. |
| | **CATEGORY E** | |
| 54 | Did You dispute those fees with Aronson? | **Overruled**. Defendants waived their privilege as to this issue by seeking Mr. Aronson's attorney's fees. |